COMMONWEALTH *vs.* RAYSHAUN J. BROWN
(and two companion cases[1]).

No. 98-P-388.

Plymouth. February 10, 2000. - October 19, 2000.

Present: JACOBS, RAPOZA, & GELINAS, JJ.

*Evidence,* Joint venturer, Constructive possession.

At a criminal trial of codefendants on indictments charging unlawful posses-
sion of guns and ammunition, the evidence was insufficient to demonstrate
that any defendant actually or constructively possessed the contraband or
engaged in a joint venture to do so; the trial judge should have allowed the
defendants' motions for required findings of not guilty. [256-259]

COMPLAINTS received and sworn to in the Plymouth Division
of the District Court Department on March 14, 1996.

The case was tried before *Daniel B. Winslow,* J.

*Lisa Siegel Belanger* for Anthony T. Goodwin.

*John Jr. Holmgren* for Marcus Hurd.

*Paul C. Brennan* for Rayshaun J. Brown.

*William McCauley,* Assistant District Attorney, for the
Commonwealth.

JACOBS, J. Tried to a District Court jury, each of the defendants
was convicted of four charges[2] based on possession of guns and
ammunition. The defendants appeal from the ensuing judgments.
We reverse.

---

[1]Commonwealth *vs.* Anthony T. Goodwin, and Commonwealth *vs.* Marcus
Hurd.

[2]The complaints against the defendants originally contained nine counts
charging various crimes, including breaking and entering, armed assault in a
dwelling, and drug offenses. Before the jury were empaneled, the complaints
were amended twice, partly in order to permit the District Court to retain
jurisdiction. At the conclusion of the Commonwealth's case, the judge al-
lowed in part the defendants' motions for required findings, and directed the
clerk to prepare an amended complaint containing just four charges.
Ultimately, the jury rendered guilty verdicts on all four charges: possession of
a firearm without a license, G. L. c. 269, § 10(*a*); possession of ammunition
without a firearm identification card, G. L. c. 269, § 10(*h*); possession of a

1. *The evidence.* At about 11 P.M. on March 13, 1996, Brockton police received three 911 telephone calls from individuals who reported hearing gunshots in their neighborhood. The first caller reported hearing arguing and shooting outside her home. The second caller reported hearing five or six shots fired, going to a window, and seeing three black men wearing "hoodies" running through a parking lot across the street from her, then running around the rear of a nearby house, emerging at the front, and entering the front door. Moments after this call the police received a third call from a woman who also reported hearing the shots and, while she was on line with the 911 operator, stated she heard someone banging on the door of the apartment next to her, which the police determined was located in the house referred to by the second caller.

In addition to several police officers who responded to the telephone calls, only the second caller testified at trial. Her testimony differed somewhat from her 911 call.[3] She testified that she heard one gunshot different from the rest, and then several consecutive shots. She described the three men she saw from the window of her apartment as young black men, one "fairly light," all about five feet, eight inches tall, and about the same size. She further testified these men were wearing dark jeans, and that she saw one, and possibly two, of them with hoods. She stated they were running fast, one with his hands down and the other two "like they were hugging themselves." This witness was not able to describe them further, and did not make an in-court identification.

The second caller also testified that, after first calling the police, she went back to the window. She saw two men come out of the house she had previously described, then go to an area at the side of that house where a dumpster and shed were located, remain there for about half a minute, then run back into

---

shotgun without a license, G. L. c. 269, § 10(*a*); and discharge of a firearm within 500 feet of a dwelling, G. L. c. 131, § 58.

[3]Two statements the caller made in her telephone call were challenged at trial, and the caller modified them in her testimony. In the telephone call she reported that there were "three black males firing a gun in the parking lot." She later testified that she heard gunshots, then went to her window and saw the three black males running. She acknowledged that she had not seen anyone with guns and that she had not seen any of the three men discharge a weapon or fire guns in the air.

In her call she stated that the three men "had hoodies on." She later testified that she saw "[a]t least one, possibly two" with hoods.

the house through the front door. She described them as about five feet, eight or nine inches tall, and wearing dark clothes, sweatshirts and jeans, one of them wearing a hood. She saw both of them standing two or three feet away from the dumpster, was unable to see whether they had anything in their hands, and did not see anything thrown into the dumpster. She briefly lost sight of one of them when he went to the area of the shed. She stated that there was "nothing different" about these two men from the three she had earlier observed going into the house.

After the police arrived, they entered the house and knocked on the front door of the apartment to which the third caller had referred. The police identified themselves, but obtained no response, although they could hear movement inside. Other police, stationed at the rear entrance, saw a woman with a young child hurriedly walk out of the rear door. There was evidence that this woman occupied the apartment and that her name was on the mailbox. Upon entering the living room of the apartment, the police found the defendants Brown and Hurd sitting on a couch, slouched down, and another man, Edward Vasquez, on a second couch, and the defendant Goodwin kneeling or sitting on the floor between the couches.[4] The collective testimony of the police officers may be viewed as establishing that, when they encountered the three defendants, they were wearing dark clothing and sweatshirts or jackets with hoods. The officers also described Hurd as six feet or six feet, one inch tall; Brown about five feet, ten or eleven inches, Goodwin about five feet, seven or eight inches, and Vasquez as Hispanic and five feet, six or seven inches tall.

After ordering the men to lie down on the floor, the police searched the living room, and found a loaded nine millimeter handgun under the couch where the defendants Hurd and Brown had been sitting. Searching outside the house, the police found a loaded, sawed-off shotgun in the dumpster and an unloaded .25 caliber handgun in the shed. There was evidence that three spent cartridges found nearby in the street had been fired from the .25 caliber handgun.

2. *Discussion.* The Commonwealth proceeded with two theories at trial. First, that each defendant could be found guilty of possession of one or more of the firearms as a joint venturer;

---

[4]Vasquez was charged with and tried on the same offenses as the defendants. His motion for required findings of not guilty on all the charges was allowed by the trial judge at the close of all the evidence.

and second, that each defendant also could be found guilty of constructive, if not actual, possession of a single firearm, even though there was no direct evidence connecting any one of the three defendants to any specific firearm seized. The judge essentially gave established instructions on possession, actual and constructive, and joint venture. Because the "theories of constructive possession and joint venture are . . . alternative theories with which to connect an accused to the crime," *Commonwealth* v. *Robinson*, 43 Mass. App. Ct. 257, 261 (1997), we examine separately the application of these theories.

While there is support for an inference that the defendants ran from the area where gunshots were heard, that one or more of them had fired the .25 caliber handgun, and that they sought to conceal themselves from the police, they were not tried for any direct participation in the shooting. They were charged solely with unlawfully possessing guns and ammunition, and the Commonwealth treated the charges as presenting "a straight possession case." These are not crimes with additional elements, as for example, discharging a firearm within 500 feet of a dwelling in use (see G. L. c. 269, § 12E). "There is no question that one may be found guilty as an accessory to a crime that involves possession as an element. . . . To convict on a theory of accessorial responsibility, it is not necessary to show that the defendant himself possessed the [contraband], either actually or constructively, . . . but it is frequently said that it is necessary to show that the defendant aided in the possession and in each other element of the substantive offense." *Commonwealth* v. *James*, 30 Mass. App. Ct. 490, 498-499 (1991) (citations omitted). "To establish liability under th[e] theory [of joint venture], . . . it would not be necessary to prove that [a] defendant had possession — actual or constructive," *Commonwealth* v. *Pichardo*, 38 Mass. App. Ct. 416, 416 n.1 (1995), but only that an identified defendant was accessory to another identified defendant in possessing a firearm. Here, there is no evidence that any specific defendant aided another defendant in firing, or gaining or maintaining possession of, the guns, and thus no identified defendant can be linked as a joint venturer to possessing a specific weapon.[5] Also, because there is no element other than possession in the substantive offenses charged,

---

[5]As the defendant Brown argues, "it is hard to conceive that there could be many circumstances which could support an inference of a joint venture where the highest element of the offense charged is simple possession, and

the defendants cannot be seen as jointly aiding each other in a further criminal enterprise involving possession. Compare *Commonwealth* v. *Carmenatty*, 37 Mass. App. Ct. 908 (1994); *Commonwealth* v. *Sadberry*, 44 Mass. App. Ct. 934, 936 (1998). We conclude that a joint venture theory was inapplicable and should not have been submitted to the jury. The issue was preserved by the defendants' motions for required findings of not guilty. See *Commonwealth* v. *Sanchez*, 40 Mass. App. Ct. 411, 419 (1996). This case is analogous to *Commonwealth* v. *Deagle*, 10 Mass. App. Ct. 563, 566 (1980), where the defendant was charged with conspiracy to possess with intent to sell an illegal substance. There we observed that, "as independent evidence of an agreement is lacking, that is to say, as the train of logic is that the existence of a conspiracy is to be inferred, if at all, from the fact of doing the very thing which is the object of the alleged conspiracy, it follows that a conspiracy is not made out unless the act, in this case possession, is itself made out."

Accordingly, we examine the evidence to determine whether it was sufficient to sustain the alternative theory of possession. See *Commonwealth* v. *Latimore*, 378 Mass. 671, 677-678 (1979). As to actual possession, there was no direct evidence, such as by observation, fingerprints, or paraffin tests,[6] that any identified defendant actually possessed any of the three weapons. However, "[p]ossession need not be exclusive. It may be joint and constructive, and it may be proved by circumstantial evidence." *Commonwealth* v. *Beverly*, 389 Mass. 866, 870 (1983). "Possession may often be inferred from proximity conjoined with knowledge; but the reasonableness of such an inference depends upon the circumstances." *Commonwealth* v. *Deagle, supra* at 567-568. See *Commonwealth* v. *Fernandez*, 48 Mass. App. Ct. 530, 532 (2000). Because there is no evidence specifically identifying the two men observed near the area of the shed and the dumpster where the .25 caliber handgun and the shotgun were found, proof of actual or constructive possession of these two weapons by any individual defendant is lacking. The logical inference that two of the three defendants may each have possessed a gun is not a substitute for proof

---

where the element of possession is not the predicate for further criminal activity, e.g., possession with intent to distribute."

[6]Although there was evidence the .25 caliber handgun had been fired, no paraffin tests for gunpowder residue were performed on the defendants' hands or clothing.

beyond a reasonable doubt that an identified defendant possessed a specific gun. Similarly, a probability that one of the defendants fired the .25 caliber handgun is insufficient to implicate any specific defendant or to convict the others of joint and constructive possession. As juries long have been instructed, "it is not sufficient to establish a probability, though a strong one arising from the doctrine of chances, that the fact charged is more likely to be true than the contrary; but the evidence must establish the truth of the fact to a reasonable and moral certainty." *Commonwealth* v. *Webster*, 5 Cush. 295, 320 (1850).

We also conclude that the evidence is insufficient to sustain the charge that the defendants jointly and constructively possessed the nine millimeter handgun found under the couch. It was not in plain view, and was discovered only after the couch on which two of the defendants were sitting was lifted from the floor by the police. That couch sat low to the floor on legs only an inch or two high, and the police saw nothing under it until it was lifted. Although all the defendants were in close proximity to the gun, the police observed no suspicious movements on their part in relation to it. Moreover, while two of the men earlier were observed running as if "hugging themselves," perhaps indicating they were carrying firearms, the third was seen running with his hands down. Lastly, the gun was loaded when it was found under the couch, and the spent shells found on the street were of a different caliber. On this state of the evidence, an inference that the nine millimeter handgun was in the apartment before the three defendants arrived, and that they had no knowledge of it, is at least as reasonable as an inference of recent possession. Compare *Commonwealth* v. *Fancy*, 349 Mass. 196, 200 (1965) ("When the evidence tends equally to sustain either of two inconsistent propositions, neither of them can be said to have been established by legitimate proof").[7]

Accordingly, because the joint venture theory was inapplicable and in any event failed of proof as to any charged crime,

---

[7]Nor is the Commonwealth aided by its reliance on a consciousness of guilt theory. Even if the conduct of the two men near the dumpster and the shed gives rise to an inference of possession through the concealing of the firearms found there, there is no identification of which two of the three defendants were involved. With respect to the nine millimeter handgun found in the apartment, even if we assume the defendants were hiding from the police in the darkened living room, there is no evidence to support an inference that they placed the gun there or knew of its presence. Mere proximate presence does not support such an inference. See *Commonwealth* v. *Brown*, 34 Mass.

and the evidence was insufficient as to actual or constructive possession by any identified defendant of any of the guns and ammunition found by the police, the motions of the defendants for required findings of not guilty should have been allowed.[8]

*Judgments reversed.*

*Verdicts set aside.*

*Judgments for the defendants.*

---

App. Ct. 222, 226-227 (1993). Contrast *Commonwealth* v. *Brzezinski*, 405 Mass. 401, 409-410 (1989).

[8]Because of our decision, we need not address other issues raised by the defendants.