COMMONWEALTH *vs.* CALVIN M. DUNCAN
(and a companion case[1]).

No. 06-P-1847.

Plymouth. December 4, 2007. - January 31, 2008.

Present: DUFFLY, GREEN, & MEADE, JJ.

*Firearms. Constitutional Law,* Investigatory stop, Privacy. *Search and Seizure,*
Expectation of privacy. *Privacy. Practice, Criminal,* Sequestration of wit-
nesses, Argument by prosecutor, Severance.

Permissible inferences drawn from the evidence most favorable to the Com-
monwealth at the trial of firearm charges more than amply supported the
jury's finding of possession, an element of proof necessary to support the
defendants' convictions. [152-154]
A District Court judge properly denied a criminal defendant's motion to sup-
press evidence of a handgun that police retrieved from an outdoor trash
can in which the defendant had discarded it, where the defendant had no
reasonable expectation of privacy in the trash can, a location over which
he did not control access. [154-156]
Where the prosecutor at the trial of firearm charges instructed one of the
testifying witnesses, a police officer, to test fire certain weapons, and that
witness asked another police officer, who had not yet testified at the trial,
to undertake the task, the police officers' conversation, during which they
did not discuss their testimony, did not violate the judge's sequestration
order or otherwise engender unfair prejudice to the defendant. [156-157]
No error arose from the prosecutor's closing argument at a criminal trial,
where he commented on the defendants' appearance at trial without argu-
ing that an inference of guilt should be drawn from it, and where the judge
gave a strong curative instruction to the jury to disregard the comment.
[157-158]
A District Court judge's failure to sever a criminal defendant's case from two
other cases with which it had been joined did not create a substantial risk
of a miscarriage of justice, as there was a nexus between the three complaints
sufficient to warrant joinder. [158-159]

COMPLAINTS received and sworn to in the Brockton Division
of the District Court Department on June 23, 2003.

[1]Commonwealth *vs.* Josh Lemar.

A pretrial motion to suppress evidence was heard by *Richard D. Savignano*, J.; the cases were tried before *Paul C. Dawley*, J., and posttrial motions to set aside the verdict and for an amended judgment on the sentence were heard by him.

*Jon R. Maddox* for Calvin M. Duncan.

*Joseph F. Krowski* for Josh Lemar.

*Robert C. Thompson*, Assistant District Attorney, for the Commonwealth.

MEADE, J. Following a jury trial, the defendants were each found guilty of unlawful possession of a firearm without a license in violation of G. L. c. 269, § 10(*a*), as amended through St. 1990, c. 511, § 2, and unlawful possession of a firearm without a firearm identification (FID) card in violation of G. L. c. 269, § 10(*h*), as amended through St. 1998, c. 180, § 69. On appeal, the defendants claim that there was insufficient evidence to support their convictions; Duncan's motion to suppress should have been allowed; and a violation of the sequestration order requires a new trial. In addition, Lemar argues that the prosecutor's closing argument denied him a fair trial, and that it was an abuse of discretion to permit a joint trial of the defendants. We affirm.

1. *Background.* The evidence most favorable to the Commonwealth established that at approximately midnight on June 22, 2003, the police received a 911 telephone call based on what the caller thought might have been gunshots in the area of a large party that seemed to be getting out of control. At approximately the same time, Brockton police Detective Christopher McDermott and Officer Andrew Kalp were in plain clothes in an unmarked cruiser on their way to a detail assignment. McDermott and Kalp, who were in the area of the reported gunshots, heard a radio broadcast and responded to the scene. They arrived at the scene, Summer and Irving Streets, within thirty to forty seconds.

They parked the cruiser on Irving Street, but they did not activate the lights or siren. They saw three men, later identified as Duncan, Lemar, and Rashad Wilson,[2] walking in their direction. When the men got closer, it appeared that they recog-

---

[2] Wilson's case was severed from the others. Duncan, Lemar, and Clifford Montron were tried together. See note 3, *infra.*

nized McDermott and Kalp as police officers, and they looked like they were going to flee. The three men picked up their pace and turned in behind a nearby fence. The lead man was Duncan, who was momentarily out of police sight when he ducked behind the fence. The three men were bunched together; Lemar was directly behind Duncan. "They were so close together it looked like they were almost one, one person."

When they came out from behind the fence, the three men resumed walking in the direction of the officers. The officers stopped them, pat frisked them, and asked them for identification. Officer Kalp went behind the fence and found two handguns in a trash barrel. They were covered by a piece of paper and were resting on top of other trash. The guns were hot to the touch and completely dry. The paper on top of the guns and the trash underneath the guns were wet; it had rained earlier that night and it was still drizzling. The defendants were arrested.

As the defendants were being handcuffed, Clifford Montron came out of a nearby driveway and approached Officer Shane Cantone. Cantone instructed Montron to leave; Montron refused. While Detective McDermott spoke with Montron, Officer Cantone checked the area of the driveway. Under some bushes to the left of the driveway, Cantone discovered a handgun. Montron alone was arrested for charges relating to this gun.[3]

2. *Sufficiency of the evidence.* "When analyzing whether the record evidence is sufficient to support a conviction, an appellate court is not required to 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt' (emphasis in original)." *Commonwealth* v. *Laro*, 68 Mass. App. Ct. 556, 558 (2007), quoting from *Jackson* v. *Virginia*, 443 U.S. 307, 318-319 (1979). Nor are we obligated to "reread the record from a [defendant]'s perspective." *Palmariello* v. *Superintendent of M.C.I. Norfolk*, 873 F.2d 491, 493 (1st Cir.), cert. denied, 493 U.S. 865 (1989). Rather, the relevant question is " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt' (emphasis in original)." *Commonwealth* v. *Latimore*, 378

---

[3]Montron was also a defendant at trial, and he was convicted of the same offenses as the defendants, but he is not a party to this appeal.

Mass. 671, 677 (1979), quoting from *Jackson* v. *Virginia, supra* at 319.

When evaluating sufficiency, the evidence must be reviewed with specific reference to the substantive elements of the offense. See *Commonwealth* v. *Latimore*, 378 Mass. at 677-678. See also *Jackson* v. *Virginia, supra* at 324 n.16. To establish the defendants' guilt of unlawful possession of a firearm under G. L. c. 269, § 10(*a*), the Commonwealth was required to prove that the defendants (1) knowingly (2) had in their possession (3) a firearm (4) without a license. The elements of possession of a firearm without an FID card under G. L. c. 269, § 10(*h*), are (1) possession (2) of a firearm (3) without complying with the requirements relating to FID cards as provided by G. L. c. 140, § 129C. Here, both defendants claim that there was insufficient evidence to establish that they possessed the handguns, an element of proof necessary to support both convictions. We disagree.[4]

Here, the permissible inferences drawn from the evidence most favorable to the Commonwealth more than amply support the jury's finding of possession. In particular, the officers arrived at the scene within thirty to forty seconds of the dispatch call regarding the reported gunshots, and soon after found the hot, dry guns in the trash can, which otherwise held wet refuse. This supports the inference that the officers arrived shortly after the shots were fired, and shortly after the discharged guns were discarded.[5]

From the evidence of the defendants' behavior upon seeing

[4]Lemar also claims that even if there was sufficient evidence of possession, there was insufficient evidence that he "carried" the firearm. However, the cases relied upon by the defendant all predate the 1990 amendment to G. L. c. 269, § 10(*a*), which eliminated the words "carries on his person" from § 10(*a*). See St. 1990, c. 511, § 2. Since the time of that amendment, § 10(*a*) has simply prohibited the knowing possession of a firearm without a license. See *Commonwealth* v. *Colon*, 449 Mass. 207, 225-226 (2007).

[5]Duncan claims, based on one witness's testimony, that because the police did not arrive at the scene until twenty to thirty minutes after the 911 call, it is equally likely that someone other than the defendants discarded the guns in the trash can. However, the witness also admitted that she did not "really know" how long it took the police to arrive, and that they may have responded sooner or even later. The elementary problem with Duncan's claim is that it views the evidence in the light least favorable to the Commonwealth. See *Commonwealth* v. *James*, 30 Mass. App. Ct. 490, 491 n.2 (1991). The jury were free to believe

the officers, their moving behind the fence as a group close to one another near the trash can where the guns were found, and their being the only persons in the immediate vicinity of the fence, the jury could properly conclude that the defendants endeavored to conceal the guns by placing them in the trash immediately after they recognized McDermott and Kalp as police officers. This conclusion is further buttressed by the fact that the guns were dry and the trash around them was wet from the falling rain.

From all this evidence, the jury were free to conclude that the defendants knowingly possessed the guns. It matters not whether the evidence is viewed through the lens of actual as opposed to constructive possession because they are not different theories. *Commonwealth* v. *Fernandez*, 48 Mass. App. Ct. 530, 532 (2000). "Rather, they are simply two possible ways of defining the same legal principle[;] [t]he essential elements of either sort of possession are knowledge plus ability and intention to control." *Ibid.* Thus, because the evidence supports the conclusion that the defendants placed the guns in the trash can, and did so with knowledge and control over them, a reasonable fact finder could conclude that they possessed the guns. See *Commonwealth* v. *Sann Than*, 442 Mass. 748, 751 (2004) (defendant's movement in area where gun is later discovered permitted finding of possession); *Commonwealth* v. *Whitlock*, 39 Mass. App. Ct. 514, 519 (1995) (evidence of "attempts to conceal or dispose of contraband . . . permit an inference of unlawful possession"); *Commonwealth* v. *Mojica*, 59 Mass. App. Ct. 925, 926 (2003) (defendant was properly found to be in possession of heroin he dropped). This is especially true because the Commonwealth was not required to prove that the possession was exclusive, and instead could be accomplished jointly among the defendants. See *Commonwealth* v. *Watson*, 36 Mass. App. Ct. 252, 259 (1994) ("[p]ossession need not be exclusive, and joint possession may be proved circumstantially").[6]

3. *The motion to suppress.* Defendant Duncan argues that it

---

that the police responded sooner than Duncan would have it. See *Jackson* v. *Virginia*, 443 U.S. at 319 (it is "the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts").

[6]The defendants' reliance on *Commonwealth* v. *Brown*, 50 Mass. App. Ct. 253 (2000), is misplaced. In *Brown*, there was no evidence that identified the

was error to deny his motion to suppress the guns because the 911 call provided an insufficient basis for the investigatory stop of him and the others. We disagree. Even if we were to conclude that the defendant had automatic standing to challenge the seizure of guns under *Commonwealth* v. *Amendola*, 406 Mass. 592, 600-601 (1990),[7] he would not be relieved of the burden to demonstrate that he or one of the other defendants had a constitutionally protected reasonable expectation of privacy in the area that the police searched. See *Commonwealth* v. *Carter*, 424 Mass. 409, 411-412 (1997); *Commonwealth* v. *Rise*, 50 Mass. App. Ct. 836, 841 (2001). See also *Commonwealth* v. *Frazier*, 410 Mass. 235, 244 n.3 (1991) ("In cases where possession is an essential element of the crime we think it is best to separate the issue of standing from the question whether there has been a search for constitutional purposes"). In other words, automatic standing does not permit a defendant to "assert the constitutional rights of someone in no way involved with his allegedly criminal conduct." *Commonwealth* v. *Carter*, 424 Mass. at 411 n.3. See Grasso & McEvoy, Suppression Matters Under Massachusetts Law § 3-5[f] (2006-2007 ed.).

Thus, it was the defendant's burden to prove both that he had

defendants as the men near the area of a shed where the gun was found, and no movement by the defendants that linked them to the gun found under the couch. *Id.* at 257-258. Here, as described above, the defendants were identified at the scene as the men who had ducked behind the fence where the guns were found in circumstances supporting the inference that the guns had just been placed there.

[7]Under art. 14 of the Massachusetts Declaration of Rights, automatic standing is conferred on a defendant "charged with a crime in which possession of the seized evidence at the time of the contested search is an essential element of guilt. . . ." *Commonwealth* v. *Amendola*, 406 Mass. at 601. See *Jones* v. *United States*, 362 U.S. 257, 263 (1960) (announcing now defunct automatic standing rule under Fourth Amendment to United States Constitution). The Supreme Judicial Court expressly limited the application of the rule to the facts in *Amendola*, i.e., automobile searches, and to the facts of *Jones*, i.e., house searches, and left for "a case by case analysis the question whether the rule should be extended to other circumstances where possession crimes are in issue." *Commonwealth* v. *Amendola*, *supra* at 601 n.4. See Smith, Criminal Practice & Procedure § 24.81 & n.1, at 420 (3d ed. 2007). See, e.g., *Commonwealth* v. *Frazier*, 410 Mass. 235, 241-245 (1991) (applying rule to search of handbag belonging to defendant's codefendant girlfriend). Here, the seizure occurred neither at a house nor in a car. However, given our resolution of the issue, we need not decide whether the rule should be applied to the retrieval of the guns from a trash can situated on property owned by none of the defendants.

a subjective expectation of privacy in the trash can and that society would recognize this expectation as reasonable. See *Commonwealth* v. *Montanez*, 410 Mass. 290, 301 (1991); *Commonwealth* v. *Nattoo*, 70 Mass. App. Ct. 625, 630 (2007). The defendant carried neither of these burdens. There was no evidence that Duncan (or the others) had any possessory interest in the trash can or in the property where it was situated. See *Commonwealth* v. *Sespedes*, 58 Mass. App. Ct. 907, 909 n.3 (2003). To the contrary, the evidence indicated that the defendants chose to abandon or hide the guns in a place over which they did not control access. See *Commonwealth* v. *Straw*, 422 Mass. 756, 761-762 (1996) (citing cases). Thus, for constitutional purposes, no search of the trash can took place, and the motion to suppress was properly denied.[8]

4. *The sequestration order.* Before the trial began, the judge ordered the sequestration of witnesses. During the first day of trial, the judge excluded a ballistician's certificate from evidence as a sanction for the Commonwealth's late disclosure of the document.[9] After the first day of trial, in the midst of Officer Kalp's testimony, the prosecutor instructed Officer Goucher (who had not yet testified) to test fire the weapons, and Goucher thereupon called Officer Kalp to ask him to undertake the task. The two officers went to a firing range that night, where Kalp did the test firing. Kalp testified about the test firing when his testimony resumed on the second day of trial. Both defendants claim that the conversation between the two police officers violated the sequestration order. We disagree.

---

[8]There is also no merit to Duncan's claim that his identification should have been suppressed. First, there is no indication in the record that the identification of Duncan at trial was the product of the investigatory stop as opposed to his encounter with the police that night prior to the stop. Compare *Commonwealth* v. *Johnson*, 58 Mass. App. Ct. 12, 14-15 (2003). Second, the investigatory stop of Duncan to determine what had occurred behind the fence was entirely proper. The officers responded to a scene where it was reported that shots had been fired, and they had reason to believe that there was an imminent threat to public safety. Given the defendants' furtive behavior near the fence, it was proper for the police to make the inquiry they did. See *Commonwealth* v. *Doocey*, 56 Mass. App. Ct. 550, 556-557 (2002).

[9]To prove that the defendants possessed firearms without a license, the Commonwealth was required to prove, inter alia, that the weapons were capable of firing. See, e.g., *Commonwealth* v. *Nieves*, 43 Mass. App. Ct. 1, 2 (1997).

Sequestration orders are permitted by Mass.R.Crim.P. 21, 378 Mass. 892 (1979), and lie within the trial judge's discretion. See *Commonwealth* v. *Gogan*, 389 Mass. 255, 261 (1983). Such orders are designed to prevent perjury by a witness. See *Commonwealth* v. *Jackson*, 384 Mass. 572, 582 (1981). " 'The process of sequestration consists merely in preventing one prospective witness from being taught by hearing another's testimony . . . .' Reporters' Notes to Mass. R. Crim. P. 21, Mass. Ann. Laws, Rules of Criminal Procedure at 410 (1979), quoting from 6 J. Wigmore, Evidence § 1838, at 461 (Chadbourn rev. 1976)." *Commonwealth* v. *Bianco*, 388 Mass. 358, 369 (1983). Generally, "each witness [must] remain out of the courtroom until he or she has testified, and [the rule] prohibit[s] the disclosure of what the evidence has been to a witness yet to testify." *Ibid.*

As the judge found, there was no violation of the sequestration order. At the March 8, 2005, hearing on the defendants' posttrial motions, in response to a question from the judge, Officer Kalp testified that he and Officer Goucher did not discuss their testimony while they were at the firing range together. A sequestration order does not prevent a prosecutor from seeking additional evidence during a trial, and there was no unfair prejudice to the defendants by his doing so.[10]

5. *The prosecutor's closing argument.* For the first time on appeal, defendant Lemar claims that the prosecutor's closing argument denied him a fair trial. The challenged comment was the prosecutor's request that the jury look at the defendants and his suggestion that by appearance they were not high school students who would run out of fear of being arrested for underage drinking. Immediately following the prosecutor's closing argument, the judge, sua sponte, instructed the jury "in as strong as possible terms" to disregard the comment because it "was not evidence in this case."[11]

---

[10]In support of a motion pursuant to Mass.R.Crim.P. 25(b)(2), 378 Mass. 896 (1979), Duncan's sister testified that she saw Officer Kalp speak to other officers during the trial and describe where the defendants were seated. Kalp denied this allegation. In any event, as the police witnesses testifying after Kalp were never asked to identify the defendants, the defendants suffered no prejudice as a result of any such conversation.

[11]The judge instructed as follows:

"Let me explain to you briefly before I go into the instructions. There

Following the judge's instruction, counsel for Duncan noted her objection to the comment; counsel for Lemar did not object, and no one expressed any dissatisfaction with the judge's curative instruction. There was no error, and thus no substantial risk of a miscarriage of justice. See *Commonwealth* v. *Ortega*, 441 Mass. 170, 180 (2004) (where defendant does not object to remarks in prosecutor's closing argument, review is only for error which creates substantial risk of miscarriage of justice).

It is entirely permissible for a prosecutor to comment on the defendant's appearance at trial where he does not argue that an inference of guilt should be drawn from it. See *Commonwealth* v. *Kater*, 388 Mass. 519, 535 (1983); *Commonwealth* v. *Young*, 399 Mass. 527, 530 (1987). Here, the challenged comment was made in response to Lemar's argument that the defendants' behavior should be viewed as "consciousness of innocence." The prosecutor's argument offered a different perspective as to why the defendants walked toward the officers without concern after they had discarded the weapons. In any event, the judge gave a strong curative instruction to disregard the comment, and the defendants lodged no objection to the instruction as insufficient to cure the claimed prejudice. See *Commonwealth* v. *White*, 2 Mass. App. Ct. 258, 265 (1974).

6. *Severance*. Defendant Lemar claims that the trial judge should have severed his case from that of Montron, either upon Duncan's pretrial motion to sever, or, sua sponte, during trial.

was a reference by [the prosecutor] to the [d]efendants, their appearances in this courtroom. I now instruct you and direct you in as strong as possible terms that you're not to consider their appearances, physical appearances in this courtroom. That was not evidence in this case, you're not to consider that. Likewise the reference by, the reference that they're not high school students, again that's not evidence, that's not before you. You are to constrain your deliberations to the facts and the testimony that you find credible. The facts must be supported by evidence for you to draw a conclusion. I'm going to explain this to you in detail in a moment, but I just want to bring that to your attention. Likewise you just had four lawyers argue facts to you about certain testimony and evidence. If the facts they argue to you are not supported by the evidence in this case, disregard it. You are to find the facts. You are the sole and exclusive judges of the facts and in a moment I'm going to tell you, I'm going to give you some direction as to the issues of credibility and how you do find those facts. I want to bring those to your attention briefly before I instruct you further on the law."

The record reflects that Duncan, not Lemar, sought severance before trial, and there is no indication that Lemar joined that motion.[12] In that posture, the claim is being raised for the first time on appeal. To prevail, Lemar must establish that the joinder of the three cases created a substantial risk of a miscarriage of justice. Compare *Commonwealth* v. *White*, 60 Mass. App. Ct. 193, 196 n.7 (2003).

Pursuant to Mass.R.Crim.P. 9(a), 378 Mass. 859 (1979), two or more offenses may be joined if they are "related offenses . . . based on the same criminal conduct or episode, or arise out of a course of criminal conduct or series of criminal episodes connected together or constituting parts of a single scheme or plan." A trial judge may join related offenses for trial unless joinder is not in the best interests of justice. *Commonwealth* v. *Sullivan*, 436 Mass. 799, 802-803 (2002).

Here, the record establishes a nexus between the complaint against Montron and the complaints against Lemar and Duncan (which were identical) sufficient to warrant joinder. The crimes all took place on the same day, at the same time, and in the same geographic area. At the very least, they arose out of the single episode of shots being fired in the area of Summer and Irving Streets. As such, the cases were sufficiently related to join them, and Lemar has failed to show that the joinder caused him any unfair prejudice. See *Commonwealth* v. *Allison*, 434 Mass. 670, 679 (2001); *Commonwealth* v. *Pillai*, 445 Mass. 175, 180 (2005). Because there was no abuse of discretion in permitting the defendants to be tried jointly, there was therefore no risk that justice miscarried.

*Judgments affirmed.*

*Orders denying posttrial motions affirmed.*

---

[12]Duncan has not pursued this matter on appeal, and the docket does not indicate that Lemar filed a motion to sever. Similarly, the transcript from the November 5, 2004, hearing on Duncan's motion to sever does not reflect that counsel for Lemar was present or that he sought to join the motion.