COMMONWEALTH vs. DELANIE HUMPHRIES.

Worcester. March 4, 2013. - July 12, 2013.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, & DUFFLY, JJ.

*Firearms. Evidence,* Firearm, Joint venturer, Presumptions and burden of proof. *Joint Enterprise. License. Practice, Criminal,* Presumptions and burden of proof, Affirmative defense, Assistance of counsel, Instructions to jury.

This court concluded that, where a criminal defendant is charged with a possessory firearms offense on a theory of joint venture, the defendant bears only the burden of raising the defense that his coventurer was licensed to possess a firearm before the burden shifts to the Commonwealth to prove the absence of that license beyond a reasonable doubt [767-771]; however, at a criminal trial, the Commonwealth had no burden to prove the absence of a license beyond a reasonable doubt where the defendant failed to raise the defense of license before trial in accordance with Mass. R. Crim. P. 14 (b) (3) [771].

A criminal defendant alleging ineffective assistance arising from his trial counsel's failure to discover certain allegedly exculpatory evidence before trial did not demonstrate that counsel's actions deprived him of an otherwise available, substantial ground of defense. [771-773]

At a criminal trial, the judge was not required to instruct on the statutory exceptions to the definition of "firearm" where the evidence raised no such issue. [773-774]

INDICTMENTS found and returned in the Superior Court Department on December 21, 2007, and March 5, 2010.

The cases were tried before *Peter W. Agnes, Jr.,* J., and a motion for a new trial was considered by him.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Thomas D. Frothingham* for the defendant.

*Stephen J. Carley,* Assistant District Attorney, for the Commonwealth.

DUFFLY, J. Early in the evening of October 26, 2007, the defendant engaged Luis Acevedo in a fight in the middle of a residential street in Worcester. After the two men threw several

punches at each other, the defendant moved back and called out, "Bobo," whereupon a man stepped out from behind a tree, fired a gun, and fled. Acevedo departed quickly from the area in an automobile driven by his friend, Andrew Robinson. A few minutes later, additional shots were fired, striking the automobile. For his role in the shooting, the defendant was indicted for assault with intent to murder Acevedo; assault with intent to murder Robinson; assault of Acevedo by means of a dangerous weapon; assault of Robinson by means of a dangerous weapon; and various firearms offenses.

At trial, the Commonwealth proceeded under the theory that the defendant, who did not actually possess the gun, was guilty of the charged offenses as a joint venturer. Before the case was submitted to the jury, the judge allowed the defendant's motion for a required finding of not guilty on the indictment charging assault with intent to murder Robinson. The jury found the defendant guilty of both indictments charging assault by means of a dangerous weapon, and of the following firearms charges: carrying a firearm without a license; carrying a loaded firearm without a license; and possession of ammunition without a firearm identification (FID) card.[1] The jury acquitted the defendant of the indictment charging assault with intent to murder Acevedo.

In his motion for a new trial, the defendant asserted that a new trial was required because of newly discovered evidence. The motion judge, who was also the trial judge, denied the motion, and the defendant appealed. In an unpublished memorandum and order issued pursuant to its rule 1:28, the Appeals Court affirmed the defendant's convictions and the denial of the motion for a new trial. See *Commonwealth* v. *Humphries*, 81 Mass. App. Ct. 1130 (2012). We allowed the defendant's application for further appellate review.

The defendant contends that his firearms convictions should be reversed because the Commonwealth failed to prove beyond a reasonable doubt that his coventurer had not been issued a

[1]The indictment charging the defendant with carrying a firearm in violation of G. L. c. 269, § 10 (*a*), was returned over two years after the return of the other indictments, under a separate Superior Court docket number. The cases were tried together and consolidated for appeal.

license to carry a loaded firearm. The Commonwealth takes the position, accepted by the Appeals Court, that the defendant was required to raise the existence of a license issued to his coventurer as a defense, and to introduce some evidence of that license, before the burden shifted to the Commonwealth to prove the absence of license beyond a reasonable doubt. We conclude that, where a defendant is charged with a possessory firearms offense on a theory of joint venture, the defendant does not bear the burden of producing evidence that his coventurer was licensed to possess a firearm before the burden shifts to the Commonwealth to prove the absence of that license beyond a reasonable doubt;[2] however, the defendant must raise the defense of license before trial in accordance with Mass. R. Crim. P. 14 (b) (3), as amended, 442 Mass. 1518 (2004) (rule 14). Because the defendant in this case failed to raise the defense of license, as required by rule 14, we do not reverse his firearms convictions on this basis.

The defendant argues also that his counsel was ineffective for failing to discover certain allegedly exculpatory evidence before trial, that the judge provided an incomplete definition of a "firearm" in his final charge, and that the evidence was insufficient to prove that the firearm met this definition. We affirm the defendant's convictions and the denial of his motion for a new trial.

*Facts.* We recite the facts the jury could have found, reserving certain details for our discussion of the specific issues raised.[3] In the late afternoon and early evening of October 26, 2007, Shaonte Bottom hosted a birthday party for her young daughter at the home of her aunt on Gates Street in Worcester. Bottom's boy friend, Robinson, and Robinson's close friend, Acevedo, were among the adults in attendance. Also at the party was Monique Kumah, the defendant's girl friend. Bottom and Kumah had been friends for a long time, but at the time of the party, the relationship between them was "rocky."

During the party, Acevedo confronted Kumah, asking her

---

[2]We do not address whether a defendant tried jointly with a coventurer would be required separately to raise the defense of that coventurer's license.

[3]The defendant does not challenge the sufficiency of the evidence supporting the theory of joint venture as a basis for the guilty verdicts.

why she had lied to her boy friend, the defendant. Approximately twenty-five minutes after her arrival, when Kumah became "loud [and] rude" and started swearing in the presence of the children, Bottom asked Kumah to leave. Kumah was yelling obscenities as she left. She asked Bottom to allow her to use Bottom's cellular telephone to call her boy friend, but Bottom refused. When Kumah started yelling, Acevedo laughed at her, and Robinson called her a "drunk bitch." Kumah told Robinson to stay out of the fight, saying that the defendant would fight only with Acevedo. As Kumah walked out of the house, she yelled that she wanted to telephone the defendant in order to tell him to come fight with Acevedo.

Approximately twenty-five minutes after Kumah's departure, Bottom was standing with her cousin on the third-floor porch of her aunt's house, which faces Gates Street and overlooks Crystal Park directly across the street. Gates Street borders one side of Crystal Park and Crystal Street borders the opposite side. The park is also bordered by Main Street and by Illinois Street. Bottom could see the defendant to her right, approaching from the direction of Main Street. The defendant, who told police he had parked his car a block away so that it would not get damaged, turned left onto Gates Street from a side street. He was moving fast and walking in the middle of the street. Bottom also saw Acevedo standing by himself in front of the house.

When the defendant reached Acevedo, he made gestures with his hand, as if to draw Acevedo into the street. The defendant and Acevedo approached each other in the middle of the street. At that point, the defendant was facing Acevedo with his back to the park and Acevedo was facing the park, with his back to Bottom. The two men argued loudly about a woman. Then the defendant said, "Let's shoot the fair one." According to Bottom, this meant that the defendant was suggesting a one-on-one fight with no weapons. A fistfight between the two men ensued. After approximately forty-five seconds, the defendant stepped quickly back in the direction of Main Street, out of the way, loudly calling out "Bobo" and pointing towards the park.

Immediately after the defendant yelled "Bobo," a man in a gray hooded sweatshirt stepped out from behind a tree in the park and reached for something in his waistband. The man was ten

to fifteen feet away from the defendant and Acevedo. Although it was dark, Bottom had a clear view, and the area was illuminated. Bottom could see the man's freckles and recognized him as Rashayn Holley, who lived in her neighborhood.[4] She had known him for about fifteen years. The defendant told police that Holley was his cousin, and that he knew Holley would be at the park. Holley pulled an object wrapped in a towel from his waistband; the object, which Bottom believed to be a firearm, was longer than Holley's hand. As Holley pulled the object from his waistband, Bottom heard an initial pop; there was a pause, then Holley raised his outstretched arm and fired two more shots. Bottom's cousin said, "He got a gun, get down."

Following the initial gunshot, Acevedo hid behind an automobile that was parked on the opposite side of the street, in front of Bottom's aunt's house. A white Mercedes sedan that Robinson used on a regular basis was parked nearby, on the same side of the street. Robinson was in the house during the shooting. When the shooting stopped, Robinson, joined by Acevedo, ran to the white sedan; Acevedo got in on the passenger side and Robinson on the driver's side. Robinson turned the automobile around and drove towards Illinois Street. It appeared to Bottom that they were going to drive around Crystal Park.

Following the shooting, the defendant walked over to Holley, and they engaged in a quick verbal exchange; Holley then fled into Crystal Park and the defendant ran down a side street away from the park. After the white sedan had driven out of sight, Bottom heard two more gunshots. When Acevedo and Robinson returned to Gates Street in the white sedan several minutes later, Bottom could see what appeared to be bullet holes in its exterior. According to a police expert, the damage was consistent with the vehicle having been struck with projectiles from a handgun and not a rifle.

Worcester police officers interviewed the defendant several days later. Portions of the videotaped interview were introduced in evidence at trial. During the interview, the defendant admit-

---

[4] "Bobo" was Rashayn Holley's nickname. Although Shaonte Bottom recognized Holley, until she heard the defendant call out "Bobo," she had not known Holley's nickname.

ted that he had fought with Acevedo on October 26 because Acevedo had threatened his girl friend, Kumah, before that date. The defendant explained that he had arranged that Holley join him on October 26, and that Holley "jump in" the fight if necessary. The defendant denied hearing gunshots or knowing that Holley had a gun.

*Discussion.* 1. *Defense of license.* The Commonwealth's position at trial was that the jury could find the defendant guilty of the firearms offenses as a joint venturer because he had encouraged Holley to carry a loaded firearm while the defendant fought Acevedo, and had acted as a decoy so that Holley, his coventurer, could shoot Acevedo. No evidence was introduced establishing that Holley was not licensed to carry a firearm or to possess ammunition.[5] The Commonwealth maintains that the defendant was required to raise the existence of a license issued to Holley as a defense, and to introduce some evidence of that license. The defendant contends that, where a coventurer of the defendant possessed the firearm, the Commonwealth must prove beyond a reasonable doubt the absence of that coventurer's license in order to establish the defendant's guilt.

In the ordinary case, a defendant charged with a possessory firearms offense can raise the defendant's own license as a defense. See *Commonwealth* v. *Gouse*, 461 Mass. 787, 802-803 (2012) (*Gouse*), and cases cited. Such a defendant must, prior to trial, provide notice of intent to raise the defense of license, see Mass. R. Crim. P. 14 (b) (3), and must produce "some evidence" of license at trial before the burden shifts to the Commonwealth to prove the absence of the defendant's license beyond a reasonable doubt. See *Gouse, supra* at 806.

Here, however, the defendant was convicted of the firearms offenses on a theory of joint venture; the Commonwealth did not pursue theories of joint or constructive possession of a firearm.[6] "The theory of 'joint venture' liability finds its roots in the concept of accessorial or accomplice liability." *Commonwealth* v. *Zanetti*, 454 Mass. 449, 461 (2009). Thus, in

---

[5]The judge instructed the jury that the existence of a license or a firearm identification (FID) card was "not relevant to any of the fact questions you have to decide."

[6]Where a defendant is charged with actual, constructive, or joint possession

order to establish liability for firearm possession under a theory of joint venture, it is not necessary that the Commonwealth prove that a defendant had actual or constructive possession of a firearm, but only that such a defendant "was accessory to another identified defendant in possessing a firearm." *Commonwealth* v. *Brown*, 50 Mass. App. Ct. 253, 256 (2000). Because "a joint venturer is liable for his participation in the underlying substantive offense," the joint venturer's culpability depends on whether the coventurer, or principal, actually commits the underlying crime. See *Commonwealth* v. *Fluellen*, 456 Mass. 517, 522 (2010).

In this case, the defendant's culpability for carrying a firearm without a license on a theory of joint venture depends on whether Holley unlawfully carried a firearm; Holley could not have been convicted of the charged offenses if he had been issued a license to carry a firearm. Had a license been issued to Holley, and not to the defendant, the existence of the license would provide a complete defense to the charge of joint venture possession of a firearm (and of joint venture possession of ammunition) without a license.

We have not previously considered whether a defendant's burden of producing evidence of a license, as provided by G. L. c. 278, § 7, applies where a defendant must rely on the existence of a license held by a coventurer to establish his own defense.[7] In considering this issue today, we begin by examining established case law governing the defense of license as it

---

of a firearm, the defendant bears the initial burden of producing evidence of his own license. See *Commonwealth* v. *Gouse*, 461 Mass. 787, 795, 802-803 (2012) (*Gouse*). To prove joint possession of a firearm, there must be sufficient evidence establishing that a defendant exercised "control and power" over the firearm; to prove constructive possession requires evidence that a defendant had the ability to exercise "dominion and control" over the firearm. *Id.* at 795, quoting *Commonwealth* v. *Brzezinski*, 405 Mass. 401, 409 (1989).

[7]General Laws c. 278, § 7, provides that a "defendant in a criminal prosecution, relying for his justification upon a license, . . . shall prove the same; and, until so proved, the presumption shall be that he is not so authorized." We have construed this statute to impose on a defendant only the burden "to come forward with evidence of the defense. If such evidence is presented, however, the burden is on the prosecution to persuade the trier of facts beyond a reasonable doubt that the defense does not exist." *Commonwealth* v. *Jones*, 372 Mass. 403, 406 (1977).

relates to firearms offenses. As noted, the possession of a license or FID card is a defense to a possessory firearms offense; absence of a license or FID card is not an element of those offenses.[8] *Commonwealth* v. *Powell*, 459 Mass. 572, 582 (2011), cert. denied, 132 S. Ct. 1739 (2012). See *Gouse, supra* at 802-803, and cases cited. Where a defendant's own license would provide a defense to the charged offense, we have concluded that G. L. c. 278, § 7, makes the "holding of a valid license" an "affirmative defense" to a firearms offense. *Commonwealth* v. *Jones*, 372 Mass. 403, 406 (1977). Thus, we have interpreted G. L. c. 278, § 7, to require a defendant to produce "some evidence" of his own license to carry a firearm (or to possess ammunition) in a prosecution for a firearms offense. *Gouse, supra* at 806. Once such evidence is produced by the defendant, "the burden is on the prosecution to persuade the trier of facts beyond a reasonable doubt that the defense does not exist." *Id.* at 802, quoting *Commonwealth* v. *Jones, supra.*

"The phrase 'affirmative defense' is a term of art." *Commonwealth* v. *Cabral*, 443 Mass. 171, 178-179 (2005) (discussing definition in Model Penal Code § 1.12[3][c] [1985]). The "primary characteristic of an affirmative defense [is] whether it 'involves a matter of . . . justification peculiarly within the knowledge of the defendant on which he can fairly be required to adduce supporting evidence.' " *Commonwealth* v. *Vives*, 447 Mass. 537, 540-541 (2006), quoting *Commonwealth* v. *Cabral, supra* at 179. Where a defendant's defense to a charged firearms offense depends on his own license, the existence of that license is peculiarly within the knowledge of the defendant. See *Gouse, supra* at 805-806. For such a defendant, meeting this initial burden of production "would involve the 'very simple task' of 'produc[ing] that slip of paper indicating [such authorization].' " *Id.* at 806, quoting *Commonwealth* v. *Jones, supra* at 408, and *Commonwealth* v. *Couture*, 407 Mass. 178, 182, cert. denied, 498 U.S. 951 (1990). By comparison, requiring the Commonwealth to "prove in its case-in-chief that no such license

---

[8]"Consequently, we reject the defendant's assertion that [G. L. c. 278,] § 7, creates a statutory presumption that relieves the Commonwealth of proving an element of the crime, subject to the dictates of *Tot* v. *United States*, 319 U.S. 463 (1943), and its progeny." *Gouse, supra* at 802 n.17.

exists would impose a comparatively onerous burden" on the prosecutor because "there is no Statewide entity responsible for issuing licences for the carrying of firearms." *Gouse, supra* at 805-806.

The reasons that support allocating to a defendant the burden to produce evidence of a firearms license, where the defendant is charged with actual possession of a firearm without a license, do not support allocating this burden to a defendant charged as a joint venturer of unlicensed possession of a firearm, where the firearm is actually possessed by a third party. "[I]mposing the burden of production on a joint venturer in these circumstances might be unfair because he would be in no better position than the prosecutor to ascertain whether an FID card [or license] had been issued to the person who allegedly possessed the ammunition [or carried the firearm]." *Gouse, supra* at 807 n.20. Because the existence of a license establishing a third party's lawful authority to carry a firearm does not fall "peculiarly within the knowledge of the defendant on which he can fairly be required to adduce supporting evidence," *Commonwealth* v. *Vives, supra,* quoting *Commonwealth* v. *Cabral, supra,* it does not constitute an affirmative defense to joint venture possession of a firearm. See generally *Commonwealth* v. *Cabral, supra* at 180. Consequently, the affirmative defense of license provided by G. L. c. 278, § 7, is inapplicable in the circumstances of this case.

Although the existence of a license is not an affirmative defense in circumstances such as those present here, we conclude that license remains a defense to a possessory firearms offense. In reaching this conclusion, we are guided by *Commonwealth* v. *Cabral, supra* at 172, where we considered whether a defendant acting as a Massachusetts surety posting bail for a principal could raise his lawful authority to apprehend and detain the principal as an affirmative defense to a charge of kidnapping. We held that, although such lawful authority could constitute a defense to kidnapping, it was not an affirmative defense because the existence of the relevant authority was not "peculiarly within the knowledge of the defendant." *Id.* at 180, quoting Model Penal Code § 1.12(3)(c) (1985). Because the Commonwealth reasonably could be expected to prove the absence of a defendant's authority based on accessible court records, we required

only that the defendant bear the burden of raising the defense; once the defense of lawful authority is raised, the Commonwealth must prove the absence of a defendant's lawful authority beyond a reasonable doubt. See *id.* at 180-181.

Similarly, whether a third party holds a firearms license is not something "peculiarly within the knowledge of the defendant." *Id.* at 180, quoting Model Penal Code § 1.12(3)(c). A defendant is in no better position than the Commonwealth to produce evidence of a third party's license to carry a firearm or to posses ammunition. Therefore, a defendant charged with joint venture possession of a firearm bears only the burden of raising the defense of license. Once raised, the Commonwealth must prove beyond a reasonable doubt that the coventurer was not authorized to possess the firearm or ammunition. See *id.* 180-181.

The question remains whether the defendant properly raised the defense of license. Rule 14 (b) (3) of the Massachusetts Rules of Criminal Procedure provides:

> "If a defendant intends to rely upon a defense based upon a license . . . the defendant shall, within the time provided for the filing of pretrial motions by Rule 13 (d) (2) or at such later time as the judge may direct, notify the prosecutor in writing of such intention and file a copy of such notice with the clerk."

Failure to provide notice under rule 14 "renders the claim [of license] unavailable as a defense." *Commonwealth* v. *O'Connell*, 438 Mass. 658, 665 (2003). Given the absence of notice pursuant to rule 14, the Commonwealth had no burden to prove the absence of a license beyond a reasonable doubt, see *Commonwealth* v. *O'Connell*, *supra*, and the defendant's failure to comply with the notice requirement is fatal to his claim.[9]

2. *Ineffective assistance of counsel.* The defendant sought a new trial based on newly discovered evidence. In connection with his motion, he submitted insurance reports suggesting that some of the bullet damage to the white sedan driven by Ace-

---

[9]The defendant makes no claim that his counsel was ineffective for having failed to comply with the notice requirement of Mass. R. Crim. P. 14 (b) (3), as amended, 442 Mass. 1518 (2004).

vedo and Robinson had been present before the evening of the shooting. The judge denied the motion, concluding that "reasonable investigative methods focused on the white [sedan] would have led to the discovery of records of insurance claims, appraisal reports and photographs of the white [sedan] during the week before and following the shooting that was the subject of this trial." See, e.g., *Commonwealth* v. *Pike*, 431 Mass. 212, 218 (2000) (to prevail on motion for new trial based on newly discovered evidence, defendant must show that evidence was not discoverable through "reasonable pretrial diligence"). The defendant contends that his counsel's failure to discover the insurance reports before trial amounts to ineffective assistance of counsel.

A defendant is denied the constitutional right to effective assistance of counsel where the conduct of the defendant's attorney falls " 'measurably below that which might be expected from an ordinary fallible lawyer' and thereby 'likely deprived the defendant of an otherwise available, substantial ground of defence.' " *Commonwealth* v. *Glover*, 459 Mass. 836, 842 (2011), quoting *Commonwealth* v. *Acevedo*, 446 Mass. 435, 442 (2006). "[A]n ineffective assistance of counsel challenge made on the trial record alone is the weakest form of such a challenge because it is bereft of any explanation by trial counsel for his actions and suggestive of strategy contrived by a defendant viewing the case with hindsight." *Commonwealth* v. *Peloquin*, 437 Mass. 204, 210 n.5 (2002).

Here, even had counsel's conduct fallen measurably below that of an ordinary fallible attorney, the defendant was not deprived of an otherwise available, substantial ground of defense. See *Commonwealth* v. *Lanoue*, 409 Mass. 1, 5-6 (1990). At trial, a ballistics expert opined that most of the damage to the white sedan was consistent with gunshots fired from a handgun. This testimony was relevant to establish that Holley had fired a weapon with a barrel of less than sixteen inches, an element of the charged firearms offenses.[10] The defendant contends that evidence of prior projectile damage to the white sedan would

---

[10]General Laws c. 140, § 121, defines a "firearm" as a weapon "from which a shot or bullet can be discharged and of which the length of the barrel or barrels is less than [sixteen] inches . . . ."

have undermined the expert's opinion as to the source of the damage, thereby creating reasonable doubt about the type of weapon fired by Holley. However, the expert's testimony itself was equivocal as to the type of firearm used. The expert testified on cross-examination that at least one of the bullet holes could have been caused by a gunshot from a weapon with a barrel longer than sixteen inches, such as a rifle.

In addition, other evidence unrelated to the projectile damage to the sedan supported the conclusion that Holley fired a handgun. According to two witnesses, Bottom and a sixteen year old bystander, Holley reached for his waistband, grabbed something small enough to fit in his hand but a little longer than his hand, and then raised his arm; the witnesses thereafter heard gunshots. Bottom also testified to hearing gunshots while Robinson and Acevedo were driving the white sedan around the park into which the shooter had fled. Because evidence of prior projectile damage to the vehicle would not have undermined this testimony, the defendant was not deprived of a substantial ground of defense as a result of his counsel's failure to introduce the insurance reports in evidence.

3. *Supplemental jury instruction.* The defendant argues that the judge provided the jury an incomplete definition of the term "firearm," and that the Commonwealth failed to prove beyond a reasonable doubt that Holley was carrying a firearm meeting the statutory definition.

General Laws c. 140, § 121, defines a "firearm" as a weapon "from which a shot or bullet can be discharged and of which the length of the barrel or barrels is less than [sixteen] inches . . . ." Exempt from this definition is

> "any weapon that is: (i) constructed in a shape that does not resemble a handgun, short-barreled rifle or short-barreled shotgun including, but not limited to, covert weapons that resemble key-chains, pens, cigarette-lighters or cigarette-packages; or (ii) not detectable as a weapon or potential weapon by x-ray machines commonly used at airports or walk-through metal detectors."

*Id.* In his final charge, the judge instructed the jury that a firearm is a weapon capable of discharging a shot or bullet, and having

a barrel length of less than sixteen inches. Defense counsel did not request, and the judge did not provide, an instruction on the limited statutory exceptions to the definition of a firearm set forth in G. L. c. 140, § 121. Because the defendant did not object to the instruction at trial, we review to determine whether there was error and, if so, whether the error created a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Belcher*, 446 Mass. 693, 696 (2006).

"The Commonwealth's burden to prove that a weapon is a 'firearm' in the statutory sense is not a heavy one." *Commonwealth* v. *Barbosa*, 461 Mass. 431, 435 (2012), quoting *Commonwealth* v. *Loadholt*, 456 Mass. 411, 430-431 (2010), *S.C.*, 460 Mass. 723 (2011). " 'It requires only that the Commonwealth present *some* competent evidence from which the jury reasonably can draw inferences that the weapon will fire, . . .' and that it is under a certain length" (emphasis in original). *Commonwealth* v. *Loadholt, supra* at 431, quoting *Commonwealth* v. *Nieves*, 43 Mass. App. Ct. 1, 2 (1997). We have never required a judge to instruct on the statutory exceptions to the definition of a "firearm" where the evidence raises no such issue, and we decline to do so here. The evidence raised no issue involving the applicability of any statutory exception to the definition of a firearm.[11]

*Judgments affirmed.*

*Order denying motion for new trial affirmed.*

---

[11]We note that defense counsel did not request such a supplemental instruction. Cf. *Commonwealth* v. *Hooks*, 375 Mass. 284, 290 (1978), and cases cited.