APPEALS COURT 
 
 COMMONWEALTH vs. FRANCISCO NUNEZ SEVERINO.[1]

 
 Docket:
 24-P-1211
 
 
 Dates:
 June 6, 2025 – October 15, 2025
 
 
 Present:
 Englander, Toone, & Wood, JJ.
 
 
 County:
 Essex
 

 
 Keywords:
 Firearms. License. Evidence, Joint venturer, Firearm, Constructive possession, Spontaneous utterance. Constitutional Law, Right to bear arms, Double jeopardy. Practice, Criminal, Instructions to jury, Double jeopardy.
 
 

             Indictments found and returned in the Superior Court Department on December 8, 2021. 
            The cases were tried before Janice W. Howe, J.
            Edward Crane for the defendant.
            Kathryn L. Janssen, Assistant District Attorney, for the Commonwealth.
            ENGLANDER, J.  This case asks us to determine, in light of the Supreme Judicial Court's two decisions in Commonwealth v. Guardado, 491 Mass. 666 (2023) (Guardado I), same case, 493 Mass. 1 (2023) (Guardado II), cert. denied, 144 S. Ct. 2683 (2024), whether proof of a coventurer's lack of license is an essential element of joint venture liability for a firearms possession offense, where the coventurer is the person seen in possession of the firearm.  The charges in this case arose out of two shootings that occurred in August of 2021.  The defendant, Francisco Nunez Severino, and a second person (referred to as Doe) were present at a party in a Lawrence apartment when a fight broke out.  The defendant and Doe left the party in the defendant's car, but the defendant later drove Doe back to the apartment building.  Doe exited the car brandishing a gun, walked up to the apartment, and fired a shot through the apartment door.  Fifteen minutes later, one of the partygoers returned to his van parked outside.  The defendant thereafter drove alongside the van, and Doe exited the defendant's car and shot at the van.  The defendant was later arrested near the apartment; neither Doe, nor the gun, were with him.
            The defendant was charged with multiple offenses, including carrying a firearm without a license and carrying a loaded firearm without a license (as well as various assault charges).  At the defendant's trial in June of 2023, which occurred after Guardado I, the judge instructed the jury that the defendant could be found guilty of possession of a firearm without a license if the defendant "knowingly participated in the commission of the crime[s] charged alone or with others with the intent required for that offense."  The judge did not, however, instruct the jury that to convict the defendant as a joint venturer, the jury needed to find that Doe lacked a license.  The judge also instructed the jury that it could find the defendant guilty on a theory that he (the defendant) was in constructive possession of the firearm.  The judge instructed the jury that it was an element of the offense that the defendant did not have a license, and evidence was introduced (by stipulation) that he did not.  
            The defendant now argues that the judge's instruction on the joint venture firearm possession charges were erroneous because she left out a required element -- that the jury needed to find that Doe lacked a license -- and that this error created a substantial risk of a miscarriage of justice.  The defendant also argues that a 911 call made by an occupant of the apartment was improperly admitted as an excited utterance, and that such admission constituted prejudicial error requiring reversal of his convictions arising from the first shooting.
            The Commonwealth concedes that the jury instruction was erroneous as to the firearm possession charge, where the Commonwealth proceeded under a joint venture theory.  The Commonwealth disagrees with the defendant, however, as to the proper remedy for this error.  Both parties contend that we should separately analyze the sufficiency of the evidence for the joint venture theory and the constructive possession theory.  The Commonwealth argues that there was sufficient evidence that the defendant constructively possessed the firearm, and that on that basis the defendant's convictions may be affirmed.  The defendant argues that at the least a new trial is required, and also that he may not be retried on a joint venture theory because, the defendant argues, there was insufficient evidence as to that theory due to the failure to prove that Doe did not have a license.
            We agree with the parties that the jury instructions were erroneous.  When a jury is instructed on aiding and abetting for a firearms possession offense,[2] the jury must also be instructed that an essential element of the defendant's aiding and abetting/joint venture liability is that the coventurer (who was in actual or constructive possession of the firearm) lacked a license.  Where, as here, there was an error in the instruction, a new trial is in order, at which the defendant may be retried only on the theory or theories for which there was sufficient evidence at the first trial.  In the present case, the evidence as to joint venture was insufficient, because the Commonwealth did not show that the coventurer was unlicensed.  We further conclude that at the time of trial (after Guardado I but before Guardado II), the Commonwealth reasonably should have known that it had to prove that Doe lacked a license for the defendant to be guilty of aiding and abetting a firearm possession offense, and thus the defendant may not be retried on the joint venture theory.  Furthermore, the evidence as to principal liability (constructive possession by the defendant) was also insufficient, and thus the defendant may not be retried on that theory either.  As we discern no error in the admission of the 911 call, we affirm the defendant's remaining convictions.
            Background.  Based on the evidence at trial, the jury could reasonably have found the following.  During the morning of August 29, 2021, the defendant and Doe were present at a party in a fourth-floor apartment in Lawrence.  R.M.,[3] one of the eventual victims, arrived at the party while it was in progress.  At some point thereafter, the defendant and Doe pulled out police badges.  Later, an argument among some of the partygoers ensued, and the defendant and Doe left.  
            There were multiple surveillance cameras recording the area around the apartment building; video recordings of relevant events around both shootings were in evidence.  On one surveillance video, one can see Doe running away from the apartment building at 8:32 A.M.  At 8:33 A.M., the defendant exited the building, and a black SUV pulled up to the apartment building and picked up the defendant; the SUV then drove away.  
            Subsequently, at 8:45 A.M., the SUV returned.  Doe exited from the passenger side, holding a gun, and entered the apartment building.  The gun is clearly visible in the surveillance video.  As Doe entered the building, the SUV drove away.  
            Grand jury testimony from R.M. was introduced that Doe walked up the stairs to the apartment, concealing the gun as he approached.  R.M. was then leaving the party, and saw Doe's gun.  R.M. retreated to the apartment, and the occupants closed and locked the door.  Doe then shot through the door.  On the surveillance video at 8:47 A.M., Doe re-emerged from the apartment building, walked down the street for a moment, doubled back, and walked away in the other direction.  
            Following the shooting, the person who rented the apartment told everyone to leave through the back door.  R.M. did so, and a friend drove R.M. to R.M.'s brother's red van.  R.M. entered the van at 8:58 A.M.  Soon thereafter, the black SUV drove alongside the van.  R.M. immediately drove the van backward onto a cross street, as Doe emerged from the passenger side of the SUV and shot at R.M.  As R.M. pulled away, a bullet passed through the front hood of the van.  Doe then re-entered the SUV, and the SUV drove away.  
            A person in the apartment called 911 to report the shootings.[4]  In relevant part, the call transcript is as follows:[5]
Caller:  "[Y]es we have an emergency at [the apartment building], a dude just started shooting at us[.]"
911 Operator:  "Shots, how many shots?"
Caller:  "Yes, one shot through the door because we didn't open the door[.]"
911 Operator:  "How many shots?"
Caller:  "[O]ne shot and then he continued shooting outside . . . [.]"
911 Operator:  "[A]nd somebody fired a shot as in a gunshot [through] your door?"
Caller:  "[Y]es[.]"
911 Operator:  "Is anyone hurt?"
Caller:  "No, no one is hurt.  They are outside on the street right now in a SUV [sport utility vehicle] with a plate that ends in 66.  A Ford SUV . . . and they are there in a black Ford and the plate ends in 66.  . . ." 
911 Operator:  "[A]nd they fired a shot at your house?"
Caller:  "Yes, one shot at the house . . . and they're the ones who fired the shot here at the house[.]"
911 Operator:  "[A]nd they're still there?"
Caller:  "[Y]es they're here outside.  If you can please hurry up that would be perfect.  [I]t's a black SUV[,] it's a Ford SUV. . . ."
911 Operator:  "Remain on the line.  Do you still have an eye on the SUV?"
Caller:  "They're there in the SUV . . . and the plate ends in 66."[6]  
            In response to the 911 call, the Lawrence police dispatched officers to the apartment building.  Officer Betzaida Gomez-Gonzalez, the first officer on the scene, saw a vehicle matching the description from the call, moving slowly down a nearby street.  Officer Gomez-Gonzalez stopped the black SUV and ordered the defendant out of the car at gunpoint.  The defendant was the operator and only occupant of the black SUV, which was registered to the defendant.  The officers searched the car, and found a fake Drug Enforcement Administration (DEA) badge in the glove compartment.  No gun was found in the car.  
            Officer Gomez-Gonzalez gave the defendant Miranda warnings, and then questioned the defendant.  The defendant stated that he had arrived at the party with another man, announced himself as a police officer, but stated that he just wanted to drink and smoke.  Eventually one person asked the defendant whether he was a police officer.  That person assaulted the defendant with a fist and a bottle, and then "15 males" began beating the defendant.  The defendant then flashed his (fake) badge.  The defendant stated that the other man who came with him to the party left before the defendant, in a black cab.  The defendant also stated that he had returned to the party to collect his ID (identification card), and that he had asked a man to go get it for him.  
            Sergeant Paul Rossi assisted with the stop of the defendant, then walked up to the fourth floor of the apartment building.  Sergeant Rossi found a nine millimeter shell casing on the top landing.  Upon examination of the apartment, Sergeant Rossi also found a bullet hole in the apartment door and a bullet lodged in a window frame in the apartment, and the officers recovered a folding wallet and a second fake DEA badge.  
            The defendant was charged with seven counts of assault by means of a dangerous weapon (one for each occupant of the apartment), discharging a firearm within 500 feet of a building, carrying a firearm without a license, and carrying a loaded firearm without a license.  The case was tried to a jury in June of 2023.  The defendant did not raise, as a defense, that his coventurer was licensed.  The Commonwealth moved in limine to have the 911 call admitted as an excited utterance, and the judge ruled that the call was admissible.  While the judge recognized that approximately an hour had elapsed from the first shooting until the 911 call, the judge found, in part, that "although the declarant is not screaming or crying, there is a repetitiveness to the declarant's statement that suggests to me a level of excitement."  
            The Commonwealth's theory at trial was that the defendant drove the black SUV during both of the shootings, and accordingly that the defendant was guilty of aiding and abetting Doe in all the crimes charged.  The defendant stipulated that he did not have a license to carry a firearm; however, no evidence was adduced as to whether Doe had a license.  
            Several portions of the judge's instructions to the jury are also relevant.  Prior to instructing on any of the specific crimes charged, the judge instructed the jury that, "[w]hen there is evidence that more than one person may have participated in the commission of the crimes, the defendant is guilty if the Commonwealth has proved beyond a reasonable doubt that the defendant . . . knowingly participated in the commission of the crime charged alone or with others with the intent required for that offense."  As to firearm possession, the judge also instructed that the jury could find the defendant guilty either on a theory of actual possession or constructive possession.  The judge further instructed that, as to the carrying a firearm without a license charge, the jury had to find that the defendant did not have a valid license to carry a firearm.  The judge did not instruct, however, that to find the defendant guilty of either of the possession charges on an aiding and abetting theory, the jury needed to find that Doe was unlicensed.
            The jury found the defendant guilty on the firearm possession charges, as well as the charges for assault with a dangerous weapon and discharging a firearm within 500 feet of a building.  This appeal followed.
            Discussion.  1.  The possession charges.  a.  Jury instructions.  The defendant argues that his firearms possession convictions must be vacated, because the judge did not instruct the jury that to convict the defendant of aiding and abetting Doe in the possession offenses, the jury must find that Doe was unlicensed.[7]  Because the defendant did not object to the jury instructions, we review first for error, and second, for whether any error created a substantial risk of a miscarriage of justice. See Commonwealth v. Lee, 104 Mass. App. Ct. 725, 732 (2024).
            We begin with a brief overview of recent developments in our Second Amendment law relating to joint venture.  Prior to Guardado I, of course, "the possession of a license or FID card [was] a defense to a possessory firearms offense; absence of a license or FID card [was] not an element of those offenses."  Commonwealth v. Humphries, 465 Mass. 762, 769 (2013). Specifically, a defendant charged with a possessory firearms offense on a joint venture theory needed to raise the defense that his coventurer was licensed prior to trial, and if a defendant failed to do so, the defense of license was unavailable to him.  See id. at 771.
            In 2022, in New York State Rifle & Pistol Ass'n v. Bruen, 597 U.S. 1, 8 (2022) the United States Supreme Court held that "the Second and Fourteenth Amendments [to the United States Constitution] protect an individual's right to carry a handgun for self-defense outside the home."  Following Bruen, in Guardado I, the Supreme Judicial Court held that "[b]ecause possession of a firearm outside the home is constitutionally protected conduct, it cannot, absent some extenuating factor, such as failure to comply with licensing requirements, be punished by the Commonwealth."  Guardado I, 491 Mass. at 690.  Accordingly, "the absence of a license is an essential element of the offense of unlawful possession of a firearm pursuant to G. L. c. 269, § 10 (a)."  Id.
            In Guardado I, the defendant was the person alleged to have possessed the firearm, and the decision did not address joint venture liability.  See id. at 667-668.  However, a defendant's culpability under a joint venture theory "depends on whether the coventurer, or principal, actually commits the underlying crime."  Humphries, 465 Mass. at 768.  As the lack of a firearm license is an essential element of a firearms possession offense, see Guardado I, 491 Mass. at 690, it follows that an essential element of joint venture liability for such an offense is that the coventurer lacked a firearms license.[8]  Accordingly, it was error for the judge not to instruct the jury that, to find that the defendant aided and abetted Doe in the unlawful possession of a firearm, the jury must find that Doe did not possess a license to carry a firearm.[9]  Compare id. at 691 (where defendant possessed firearm, instruction as to defendant's license required).
            Furthermore, the failure to instruct the jury on this essential element created a substantial risk of a miscarriage of justice.  See Commonwealth v. Desiderio, 491 Mass. 809, 820 (2023).  In Desiderio, the Supreme Judicial Court held that "to determine whether a substantial risk of a miscarriage of justice is created by the omission of a required element from the jury instructions, the question is . . . whether the presence of the omitted element was an ineluctable, or inescapable, inference from the evidence presented at trial."  Id.  Here there simply was no evidence from which it could be ineluctably inferred that Doe did not have a license.  See id. at 821-822.
            b.  Proper remedy.  "Where a guilty verdict is reversed because of 'an error in the jury instructions,' the proper remedy is to remand for 'a new trial.'"  Guardado II, 493 Mass. at 6, quoting Commonwealth v. Vargas, 475 Mass. 338, 349 (2016).  The defendant argues, however, that the Commonwealth introduced insufficient evidence as to one or both of the theories of culpability presented at trial, joint venture or constructive possession, and accordingly that double jeopardy precludes retrial on each of those theories.[10]  The Commonwealth, for its part, argues that a new trial is not required at all, because it introduced sufficient evidence that the defendant constructively possessed the firearm, and was therefore guilty as a principal.
            Admittedly, these issues as to proper remedy are a bit complicated, because we first need to decide whether the Commonwealth presented two theories to the jury -- joint venture and principal liability -- or only a single theory.  In Commonwealth v. Zanetti, 454 Mass. 449, 464-465, 468 (2009), the Supreme Judicial Court stated, in the context of analyzing the sufficiency of evidence of guilt, that principal liability and joint venture liability should not be treated as separate theories.  See id. at 464-465 ("principal and joint venturer liability are not different theories of guilt").  Subsequent case law, however, has continued to treat joint venture and principal liability as distinct theories, at least in some legal contexts.  Thus, in Humphries, in the context of firearm possession charges, the court distinguished between theories of principal liability (actual, constructive, or joint possession) and the theory of joint venture liability.  See Humphries, 465 Mass. at 767-768 & n.6 (discussing "liability for firearm possession under a theory of joint venture").  The Humphries court analyzed the two theories and their elements separately, and noted that for a joint venture unlicensed possession theory, the defendant could defend by showing that the coventurer (principal) was licensed.  See id. at 767-768.  See also Commonwealth v. Francis, 104 Mass. App. Ct. 593, 601-604 (2024) (reviewing sufficiency of evidence as to separate "theor[ies]" of constructive possession and joint venture).  But cf. Commonwealth v. Bolling, 462 Mass. 440, 453-454 (2012).
            In determining the proper remedy for the erroneous jury instruction here, we are of the view that we must analyze the two theories separately.  As to the firearm possession charges, the theories have different elements -- for principal liability, the Commonwealth must show the defendant lacked a license, for joint venture, that the coventurer lacked one.  One cannot analyze the sufficiency of the evidence on each theory without accounting for the differences in necessary proof.[11]
            i.  Remedy as to joint venture.  As to joint venture, there plainly was insufficient evidence of a required element -- the coventurer's lack of license.  Ordinarily, this would mean that the defendant could not be retried as to that theory, as the general rule is that the Commonwealth is precluded from retrying a defendant on a theory presented at his first trial for which there was insufficient evidence.  See Marshall v. Commonwealth, 463 Mass. 529, 538 (2012); Commonwealth v. Fickett, 403 Mass. 194, 199 n.4 (1988).  In the context where the required element that was not proved is the result of a change in law after trial, however, the Supreme Judicial Court has held that the defendant may be retried, as long as there was sufficient evidence of the remaining elements.  See Guardado II, 493 Mass. at 7.  Thus, in Guardado II, the Commonwealth similarly did not introduce sufficient evidence to prove that the defendant lacked a firearms license.  Id. at 6.  However, at the time of the Guardado defendant's trial, which occurred prior to the Bruen decision, our case law had held that lack of license was an affirmative defense, not an element of the charged crimes.  Guardado II, supra at 3, 6-7.  Therefore, "the evidence against the defendant was insufficient only when viewed through the lens of a legal development that occurred after trial" -- the Bruen decision, and the subsequent application of Bruen in Guardado I.  Guardado II, supra at 7.  Double jeopardy accordingly did not prevent retrial.  Id.  See also Commonwealth v. Crowder, 495 Mass. 552, 559 (2025), cert. denied, U.S. Supreme Ct., No. 24-7498 (October 6, 2025) (for defendants tried on firearm possession charges after Bruen but before Guardado I, in which Commonwealth did not prove defendant lacked license, remedy is new trial).
            Here trial occurred after Guardado I, and thus the question is whether Guardado I made it clear that to prove the joint venture theory the Commonwealth must prove that Doe, the coventurer, was unlicensed.  We conclude that Guardado I did make that law reasonably clear.  As we discussed above, before Guardado I was decided, the Supreme Judicial Court had explained, in Humphries, that a predicate to joint venture liability is a showing that the principal committed the underlying crime.  See Humphries, 465 Mass. at 768, quoting Commonwealth v. Fluellen, 456 Mass. 517, 522 (2010) (because "'a joint venturer is liable for his participation in the underlying substantive offense,' the joint venturer's culpability depends on whether the coventurer, or principal, actually commits the underlying crime").  Here, the "underlying crime" is unlicensed possession by Doe, and after Guardado I held that lack of license was an essential element of an unlawful possession charge, a straightforward application of Humphries would have yielded the conclusion that Doe's lack of license was an essential element of the defendant's joint venture liability.  See Guardado I, 491 Mass. at 690; Humphries, supra.  Accordingly, as the Commonwealth reasonably should have known at the time of trial that evidence that the coventurer lacked a license was a required element of joint venture liability for the unlawful possession of a firearm, the Commonwealth may not retry the defendant on a joint venture theory for the charged firearm possession offenses.  
            ii.  Constructive possession.  The Commonwealth argues that the defendant's conviction can be affirmed in any event, because there was sufficient proof that the defendant himself constructively possessed the gun.[12]  To convict the defendant on a constructive possession theory, the Commonwealth must have introduced sufficient evidence of the defendant's "knowledge coupled with the ability and intention to exercise dominion and control" of the firearm.  See Francis, 104 Mass. App. Ct. at 601, quoting Commonwealth v. Romero, 464 Mass. 648, 653 (2013).  "[M]ere presence in proximity to the contraband is not sufficient to establish constructive possession.  "Rather, our cases emphasize the need for other incriminating evidence -- a so-called 'plus factor'-- in addition to evidence of proximity" (quotation and citations omitted).  Commonwealth v. Santana, 95 Mass. App. Ct. 265, 268 (2019).  A panel of this court summed up the standard as follows:
"Evidence of a defendant's mere presence in the vicinity of contraband, such as ownership or operation of a vehicle in which a firearm is found, though relevant to possession, is insufficient by itself to establish constructive possession; it must be 'supplemented by other incriminating evidence, [which] will serve to tip the scale in favor of sufficiency.'"
Francis, supra, quoting Commonwealth v. Pimentel, 73 Mass. App. Ct. 777, 780 (2009).  
            The relevant issue here is the sufficiency of the evidence as to the defendant's ability to exercise control over the gun.  Viewing the evidence in the light most favorable to the Commonwealth, see Commonwealth v. Latimore, 378 Mass. 671, 677 (1979), the jury could have found that, on two occasions, the defendant drove Doe to a location, and that Doe exited from the defendant's vehicle carrying a firearm.  Notably, the police did not recover a firearm after stopping the defendant.  Accordingly, the evidence as to the firearm placed it in Doe's actual possession, not the defendant's.[13]  See Commonwealth v. Ramos, 51 Mass. App. Ct. 901, 901-903 (2001) (insufficient evidence that defendant had intent and ability to exercise dominion and control over firearm where defendant was sitting in room with two other men, one of whom was sitting across the room and atop the firearm).  There was no evidence suggesting that Doe permitted or would have permitted the defendant to possess the firearm, nor was there evidence that the gun was, at any time, within the reach of the defendant.  Contrast Romero, 464 Mass. at 654 (defendant had ability to exercise control over firearm, based upon "defendant's proximity to the firearm, coupled with [the firearm holder's] willingness to let him handle the weapon earlier in the day").
            The Commonwealth argues that there was sufficient evidence of constructive possession where the defendant transported the firearm to the locations of both shootings.[14]  However, our case law has emphasized that reliance on the factors of ownership and operation of a vehicle alone comes "perilously close to endorsing guilt by presence at the scene of contraband, a concept we have disavowed."[15]  Romero, 464 Mass. at 658, quoting Commonwealth v. Sespedes, 442 Mass. 95, 102 (2004).  The defendant's participation in transporting Doe to the shootings, while certainly relevant to the constructive possession inquiry, is not, by itself, sufficient evidence that the defendant had the ability to control the gun, where the evidence was that the gun was in the actual possession of the shooter, Doe.
            The Commonwealth argues that Commonwealth v. Jefferson, 461 Mass. 821, 825-828 (2012), is analogous to this case.  In Jefferson, a vehicle fled from a traffic stop; a chase ensued for several blocks, until the vehicle eventually stopped.  Id. at 823-824.  The driver told the police that he had fled because he had "an open case;" when the police told the driver that he was under arrest only for motor vehicle violations, his demeanor "became cocky."  Id. at 824.  The front passenger window of the vehicle was "all the way down."  Id.  The police subsequently found a firearm off the road, in a location consistent with it having been thrown from the passenger window.  Id.  The court held that the jury could reasonably have inferred that the passenger had thrown the firearm from the vehicle.  Id. at 826-827.  The court further held that the jury could reasonably have inferred that the driver sped away in order to throw away contraband, based upon his flight from the police, and his conduct during the traffic stop, which suggested consciousness of guilt.  Id.  Accordingly, the evidence was sufficient to find both the driver and the passenger possessed the firearm.  Id. at 827-828.
            Jefferson is distinguishable from the present case.  In Jefferson, there was evidence from which a jury could infer that the driver had the ability and intent to control the firearm.  Specifically, the driver's flight from the police and the subsequent disposal of the firearm, as well as the driver's conduct including lying to the police about his motive for flight, suggested that he had control over the firearm.  See id. at 826-827.  See also Romero, 464 Mass. at 657 (discussing Jefferson, and noting that the decision in Jefferson "did not rest solely on the defendant's status as the operator of the vehicle; rather, it was based on the defendant's decision to engage in a high-speed chase and the insight that this course of action provided into his probable intent").  The defendant's conduct here, in transporting Doe to commit two shootings, does not permit a similar inference that the defendant had the ability to control the firearm, where the firearm was in Doe's actual possession.  In contrast to Jefferson, and as in Romero, here "the nature of the defendant's operation did not manifest any outward signs that the firearm belonged to him."  Romero, supra at 657-658.
            In sum, the evidence as to constructive possession was insufficient; accordingly, double jeopardy principles forbid the Commonwealth from retrying the defendant on a constructive possession theory.
            2.  Admissibility of the 911 call.  The defendant also argues that the judge improperly admitted the 911 call as an excited utterance, because the call was made approximately one hour after the first shooting, and the caller did not display sufficient excitement.  A statement is properly admitted "as an excited utterance if '(1) there is an occurrence or event sufficiently startling to render inoperative the normal reflective thought processes of the observer,' and (2) if the declarant's statement was a 'spontaneous reaction to the occurrence or event and not the result of reflective thought'" (citation omitted).  Commonwealth v. Baldwin, 476 Mass. 1041, 1042 (2017).  "We review a decision that an out-of-court statement qualifies as an excited utterance under the abuse of discretion standard."  Commonwealth v. Wilson, 94 Mass. App. Ct. 416, 423 (2018).
            The defendant's argument rests, in large part, on the assertion that the 911 call was not made as a spontaneous reaction to the first shooting, where the call occurred an hour later.[16]  Our case law has recognized that there is no "definite and fixed time limit on the excited utterance exception" -- rather, we look to whether the declarant is "still sufficiently agitated or 'under the influence of the exciting event' at the time the statement was made."  See Commonwealth v. Wilcox, 72 Mass. App. Ct. 344, 351 (2008), quoting Commonwealth v. King, 436 Mass. 252, 254 (2002).  Here the caller not only was calling to report the shooting an hour before, but also to report that the shooter had returned and was waiting outside the caller's apartment.  The imminence of the caller's concern was readily evident from his statements:  "They are outside on the street right now in a SUV with a plate that ends in 66," and "Yes they're here outside waiting for the ID.  If you can please hurry up that would be perfect."  The judge did not abuse her discretion in determining that the caller was still under the excitement of the shooting, where the caller remained in imminent fear of the shooter.  See Wilson, 94 Mass. App. Ct. at 418, 422-423 (wife's report to 911 that wife and husband argued, husband choked wife, and that husband stated he would return in fifteen minutes to kill wife, admissible as excited utterance).
            The defendant also contends that the judge improperly considered the repetitiveness of the caller as indicative of the caller's excitement, arguing that the caller was merely responding to the 911 dispatcher's repetitive questioning.  However, much of the caller's repetition is not in response to questioning; for example, the caller repeated multiple times, without prompting, that a black Ford SUV was outside of the apartment.  The judge did not abuse her discretion in determining that the 911 caller's repetition suggested excitement.[17]  
            Conclusion.  We reverse the defendant's convictions of carrying a firearm without a license and carrying a loaded firearm without a license, set aside those verdicts, and remand the case to the Superior Court for entry of judgments of not guilty on those indictments.  The judgments are otherwise affirmed.
So ordered.
            TOONE, J. (concurring, with whom Wood, J., joins).  I agree with my colleagues that the defendant's convictions of carrying a firearm without a license, G. L. c. 269, § 10 (a), and carrying a loaded firearm without a license, G. L. c. 269, § 10 (n), must be reversed and that double jeopardy principles prohibit the Commonwealth from retrying the defendant on either charge.  I write separately to explain why, in my view, the streamlined framework for instructing juries on and reviewing convictions involving aiding and abetting (also referred to as joint venture) liability set forth in Commonwealth v. Zanetti, 454 Mass. 449, 466-468 (2009), is incompatible with such charges where the underlying crime is the unlawful possession of a firearm.
            Zanetti attempted to ameliorate the "confusion and complexity" that the Supreme Judicial Court believed had resulted from the treatment of principal and joint venture liability as separate theories of guilt.  See Zanetti, 454 Mass. at 461-466.  The court expressed concern that, even though it had earlier declared "that principal liability is not a separate 'theory' distinct from joint venture liability, [it] nevertheless continue[d] to speak of them as such."  Id. at 464, citing Commonwealth v. Santos, 440 Mass. 281, 290 (2003).  Under the aiding and abetting statute, G. L. c. 274, § 2, the court explained, "the criminal actor who participates in a felony" is to be treated as "liable as a principal without regard to whether the felony is completed or committed by another."  Zanetti, supra at 467, quoting Commonwealth v. Ortiz, 424 Mass. 853, 858 (1997).  It criticized existing "so-called model jury instructions" for encouraging judges "to instruct on the required elements of the charged offense, and then separately instruct on joint venture liability, . . . as if the required elements of the charged offense apply only to prove principal liability and the joint venture elements apply only to prove joint venture liability."  Zanetti, supra at 466.  The court also faulted itself for having conducted, post-Santos, a "bifurcated analysis of the sufficiency of evidence" in which general verdicts were examined to determine "whether the evidence [was] sufficient to support a finding of guilt as to both principal and joint venture liability when each [was] alleged and when it [was] not clear from the general verdict which theory the jury adopted."  Id. at 464-465.
            The court then set forth what it described as a "far simpler" approach for addressing joint venture criminal liability:
"(1) instruct the jury that the defendant is guilty if the Commonwealth has proved beyond a reasonable doubt that the defendant knowingly participated in the commission of the crime charged, alone or with others, with the intent required for that offense; (2) continue to permit the trial judge to furnish the jury with a general verdict even when there is differing evidence that the defendant committed the crime as a principal or as an accomplice; and (3) on conviction, examine whether the evidence is sufficient to permit a rational juror to conclude beyond a reasonable doubt that the defendant knowingly participated in the commission of the crime charged, with the intent required to commit the crime."
Zanetti, 454 Mass. at 466-467.  This streamlined approach to instructing juries and reviewing convictions presumes that there is a discrete underlying "crime charged" in which the defendant may have participated as either a principal or an aider and abettor.  In Zanetti, for example, the victim was killed by a bullet fired from an automobile in which the defendant was a passenger; the defendant was charged with murder in the first degree; and at trial, the Commonwealth proceeded against the defendant on a theory of deliberate premeditation based on both principal and joint venture liability.  Id. at 449-450.  Similarly, in this case, the charges of assault with a dangerous weapon, G. L. c. 265, § 15B (b), and discharging a firearm within 500 feet of a building, G. L. c. 268, § 12E, involved discrete unlawful acts, the commission of which the defendant could have knowingly participated in as either a principal or an aider and abettor.
            Firearm possession charges are different because, for them, the theories of principal and aiding and abetting liability involve different underlying crimes.  The principal liability theory seeks to prove possession -- actual, constructive, and/or joint -- by the defendant.  See Commonwealth v. Humphries, 465 Mass. 762, 767 & n.6 (2013), citing Commonwealth v. Gouse, 461 Mass. 787, 795, 802-803 (2012) (distinguishing between "theories of joint or constructive possession of a firearm" and joint venture liability).  By contrast, the aiding and abetting theory presumes conduct -- in this case possession -- by a different person.  See Humphries, supra at 768 ("Because 'a joint venturer is liable for his participation in the underlying substantive offense,' the joint venturer's culpability depends on whether the coventurer, or principal, actually commits the underlying crime" [citation omitted]).  Depending on which theory is at issue, the Commonwealth must prove different elements concerning the alleged possessor's conduct and licensure.  For principal liability, the Commonwealth must prove (among other things) that the defendant knowingly possessed the firearm without a valid license to carry.  Commonwealth v. Collins, 496 Mass. 151, 160 (2025).  For aiding and abetting, the Commonwealth must prove that a co-venturer possessed the firearm without a valid license to carry, and that the defendant acted as an "accessory" to the co-venturer's possession of the firearm.  Humphries, supra.  See Zanetti, 454 Mass. at 466 ("to find the defendant guilty as a joint venturer, [the jury] must find that the Commonwealth has proved both the elements of the offense and the defendant's knowing participation in the offense"); Commonwealth v. Brown, 50 Mass. App. Ct. 253, 256 (2000) (joint venture liability requires "evidence that any specific defendant aided another defendant in firing, or gaining or maintaining possession of, the guns").  The reasons for these differences are plain:  by its very nature, the act of possession is tied to a particular person, see Brown, supra at 256-257, and possession of a firearm is unlawful only when that person meets certain conditions.  See Commonwealth v. Guardado, 491 Mass. 666, 686-687 (2023) (Guardado I), S.C., 493 Mass. 1 (2023) (Guardado II), cert. denied, 144 S. Ct. 2683 (2024) ("For each of the [firearm and ammunition possession] crimes of which the defendant was convicted . . . the defendant would not have been in violation of the law if he had obtained a proper license to engage in the proscribed activity").
            In a case like this one, involving charges for which the theories of principal and aiding and abetting liability rely on different underlying crimes, strict adherence to the streamlined approach in Zanetti only creates confusion.  For one thing, the "knowing participation" instruction assumes, incorrectly, that there is only one pertinent "crime charged."  See Zanetti, 454 Mass. at 467-468.  Here, following Zanetti, the judge instructed the jury that "[w]hen there is evidence that more than one person may have participated in the commission of the crimes, the defendant is guilty if the Commonwealth has proved beyond a reasonable doubt that the defendant, Francisco Nunez, knowingly participated in the commission of the crime charged alone or with others with the intent required for that offense."  She then proceeded to instruct the jury on the specific crimes charged, including as follows for the charge under G. L. c. 269, § 10 (a):
"In this case Francisco Nunez is charged with carrying a firearm without a license.  To prove the defendant is guilty of this crime, the Commonwealth must prove the following . . . things beyond a reasonable doubt:
"One, that Francisco Nunez possessed a firearm or had a firearm under his control in a vehicle;
"Two, the item Francisco Nunez possessed met the legal definition of [a] firearm;
"Three, that Francisco Nunez knew he possessed a firearm or had a firearm under his control in a vehicle;
"And four, Francisco Nunez did not have a valid license to carry a firearm."
The judge further instructed the jury that the Commonwealth could prove the element of possession by showing that the defendant constructively possessed the firearm.  With respect to licensure, the judge instructed the jury that the Commonwealth had to prove that "the defendant did not have a valid license to carry a firearm," that the parties had stipulated that he did not, and the jury must accept that fact as true.[1]  
            As the opinion of the court explains, and the Commonwealth appropriately concedes, it was error not to instruct the jury that, to find the defendant liable for having aided and abetted the firearm possession offenses, the Commonwealth had to prove that Doe lacked a license.  See Guardado I, 491 Mass. at 668.  My broader concern is that, based on these instructions, it is difficult to discern how the jury could have found the defendant liable for aiding and abetting these offenses at all.  There was no instruction regarding an underlying possession crime by Doe.  The judge's instruction on possession clarified that the Commonwealth was "not required to exclude the possibility that others may also have been in possession" of the firearm, but did not suggest that the defendant could be found liable for having knowingly participated in the unlawful possession of a firearm by Doe or anyone else.[2]  To find the defendant guilty on this theory, the jury would have had to, on their own initiative, reinterpret the instructions on the elements of c. 269, §§ 10 (a) and (n), as applicable to conduct by Doe, disregard the judge's instruction as to the parties' stipulation on the absence of licensure, and then assess whether the defendant's actions amounted to knowing participation in Doe's conduct.
            For similar reasons, I agree with my colleagues that, in analyzing the sufficiency of evidence of guilt, we cannot overlook the distinction between principal and aiding and abetting liability and simply "examine whether the evidence is sufficient to permit a rational juror to conclude beyond a reasonable doubt that the defendant knowingly participated in the commission of the crime charged, with the intent required to commit the crime."  See Zanetti, 454 Mass. at 464-467.  That is because, again, there is no single "crime charged," but rather two different underlying crimes implicated by the Commonwealth's alternative theories of principal and aiding and abetting liability.  In this context, it is appropriate for appellate courts to treat joint venture and principal liability as distinct theories and conduct their review for sufficiency of the evidence accordingly, see ante at        , citing Humphries, 465 Mass. at 767-768 & n.6, notwithstanding the Zanetti court's general admonition to the contrary.  See Zanetti, supra at 464-465.
            While I am sympathetic to the goal of eliminating needless complexity in the criminal justice system, streamlining jury instructions and appellate review cannot come at the expense of logic and basic fairness.  With that caveat, I join in the court's opinion.
 
footnotes

 
            [1] Also known as Francisco Nunez.
            [2] We recognize that, in Commonwealth v. Zanetti, 454 Mass. 449, 467-468 (2009), the Supreme Judicial Court "adopt[ed] the language of aiding and abetting rather than joint venture."  As described in greater detail infra, our case law has continued to refer, in certain circumstances, to joint venture as a separate theory of liability.  See Commonwealth v. Newson, 471 Mass. 222, 232 n.3 (2015) ("[w]e have, however, continued to refer to the theory of 'joint venture' in our case law").
            [3] A pseudonym.
            [4] Defense counsel represented to the judge, and it is undisputed on appeal, that this call occurred at 9:42 A.M., approximately one hour after the first shooting.  However, there was no evidence adduced at trial as to the time of the call.
            [5] The 911 caller and the 911 operator spoke in Spanish.  A translated transcript of the call was admitted as an exhibit.  
            [6] The 911 caller also stated, at various points, that "they want us to bring down the ID (identification card) now," that "they're here outside waiting for the ID," and that "[t]hey came to get the ID."  These portions of the transcript were redacted from the copy given to the jury.  The judge considered the full, unredacted transcript of the call in deciding whether to admit it.  
            [7] The Commonwealth concedes that it was error not to instruct the jury on Doe's licensure.  However, we independently review the defendant's argument that the judge erred in her instruction.  See Commonwealth v. Williams, 19 Mass. App. Ct. 915, 916 (1984), quoting Sibron v. New York, 392 U.S. 40, 58 (1968) ("Confessions of error, of course, do not relieve an appellate court of the performance of its appellate functions since 'proper administration of the criminal law cannot be left merely to the stipulation of parties'").
            [8] The statement in Zanetti, 454 Mass. at 464 that "principal liability is not a separate 'theory' distinct from joint venture liability," does not require a different result.  Humphries, which was decided after Zanetti, clarified that in a joint venture firearm possession case, proof that the coventurer was licensed constituted a "complete defense."  Humphries, 465 Mass. at 768.  Zanetti does not stand for the proposition that the Commonwealth need prove only the defendant's lack of license in a joint venture firearms possession case.  See id.
            [9] The defendant also argues that the judge should have instructed, as an additional element of the joint venture theory, that the defendant must have knowledge that Doe was unlicensed.  As we conclude infra that the defendant may not be retried on a joint venture theory, we need not decide this question to resolve the case before us.
            [10] The defendant has consistently maintained that the evidence as to joint venture was insufficient, and that he cannot be retried on that theory.  In his brief, the defendant conceded that there was sufficient evidence that he constructively possessed the gun.  The defendant subsequently withdrew this concession at oral argument.  Regardless, we are obligated to independently review the concessions of counsel, see Commonwealth v. Sueiras, 72 Mass. App. Ct. 439, 446 n.4 (2008), and we have done so here.
            [11] We note that the discussion of aiding and abetting in Zanetti did not address the double jeopardy bars that may arise when a case, tried on both a principal and joint venture theory, is vacated on appeal.  See Zanetti, 454 Mass. at 466-467. Instead, that discussion in Zanetti addressed our standard for reviewing the sufficiency of the evidence following a conviction, in cases in which the jury was instructed on aiding and abetting.  Id.  Nor did the decisions of the Supreme Judicial Court in Commonwealth v. Phim, 462 Mass. 470 (2012), Choy v. Commonwealth, 456 Mass. 146 (2010), and Commonwealth v. Jansen, 459 Mass. 21 (2011) clarify the application of Zanetti to cases involving a possible retrial on both principal and joint venture liability.  In Phim, 462 Mass. at 471, 473-476, the court held that there was no error in instructing the jury on joint venture liability at the defendant's second trial, even though the judge did not provide such an instruction at the defendant's first trial, where, among other factors, there was sufficient evidence of joint venture liability adduced at the first trial.  See also Choy, 456 Mass. at 152-153 (declining to reach question resolved in Phim).  Phim did not address the situation arising when the Commonwealth did not introduce sufficient evidence as to joint venture in the first trial.  In Jansen, 459 Mass. at 27-28 n.20, in which the court analyzed the sufficiency of the evidence at a first trial which resulted in a mistrial, the Commonwealth's theory was rape by joint enterprise but there was no evidence of a joint enterprise.
            [12] Because as explained infra, the evidence as to constructive possession was insufficient, we need not consider further the Commonwealth's argument that the defendant's convictions may be affirmed.  We doubt, however, that where the jury is instructed on both principal and joint venture liability, and the instructions were erroneous as to one of those theories (here, joint venture liability), that the instructional error can be considered harmless because there is sufficient evidence as to the other theory.  See Commonwealth v. Morrison, 494 Mass. 763, 774 (2024).  The case that the Commonwealth relies upon, Francis, is distinguishable; the defendant in that case was raising a sufficiency argument, and did not argue instructional error.  See Francis, 104 Mass. App. Ct. at 603-604 & n.12.
            [13] We do not suggest that the defendant needed to have exclusive possession.  See Commonwealth v. Elysee, 77 Mass. App. Ct. 833, 847-848 (2010) (defendant's control need not be exclusive).  The issue here is not the exclusivity of the defendant's control, but whether the defendant had the ability to control the firearm at all.
            [14] The Commonwealth also argues that the defendant had a motive for the shootings, namely, that he had been assaulted at the party.  However, evidence of motive bears on intent to control, not ability to control, and it is the latter that is determinative here.
            [15] The Commonwealth also may not retry the defendant on the theory that the defendant knowingly had a firearm under his control in a vehicle, see G. L. c. 269, § 10 (a), as "where the defendant is the operator of a motor vehicle in which a firearm is discovered (not on his person), the elements of constructive possession of the firearm are essentially identical to the elements of knowingly having the firearm under one's control in a motor vehicle."  Romero, 464 Mass. at 652 n.6.
            [16] The defendant asserts that the judge's decision was predicated on the mistaken belief that the 911 call immediately followed the shooting.  The judge, however, expressly considered the lapse of an hour between the shooting and the 911 call.  
            [17] "In any event, a declarant may be under the stress of a startling event without appearing to be frantic or excited."  Wilson, 94 Mass. App. Ct. at 422.
 
footnotes for concurring

 
            [1] The judge referred back to the same instructions when instructing the jury on the elements of G. L. c. 269, § 10 (n).
            [2 ]The court in Zanetti also advised judges, "when practicable," to "incorporate their instructions regarding aiding and abetting into the elements of the crime," Zanetti, 454 Mass. at 468 n.22, but doing so here would have made no difference because the jury was not instructed on the underlying possession crime to which the aiding and abetting theory applied.